# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY TRAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 10 CV 3011 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Anthony Travis, an employee of the City of Chicago, sued the City and individual defendants Michael Callahan, Emmett O'Donnell, Robert Anthony, Debbie Biniak, and Chuck Killman alleging racial discrimination, retaliation, and a hostile work environment. Now before the court is the defendants' motion for summary judgment. For the reasons stated below, the motion is granted in part and denied in part.

## I. BACKGROUND FACTS

The parties do not dispute the following facts unless otherwise indicated.

Anthony Travis, an African-American, has been an employee of the Chicago Fire Department (CFD) since December 1994. In January 1997, Travis was promoted to his current position of Senior Air Mask Technician. Travis's duties are to repair the safety equipment used by CFD members in the exercise of their life-saving duties. From 1997 onward, Plaintiff has reported to Supervising Air Mask Technician Debbie Biniak. Biniak is responsible for preparing assignment sheets and distributing the daily work assignments to individuals in Travis's role, among other duties.

Biniak reports to Robert Anthony, the Deputy District Chief of the Air Mask Division; Anthony has reported to Deputy Fire Commissioner Michael Callahan and District Chief Emmett O'Donnell. In addition to Travis, there are three other Senior Air Mask Technicians in the CFD: James Flynn, James Connolly, and James Skrocki; all three are white males. From January 1, 2008, to June 5, 2013, Travis repaired the second most pieces of equipment compared to his co-workers in the Air Mask Division.

## A.    City Policies

The City's express policy codified in the Municipal Code of Chicago prohibits discrimination, harassment, or retaliation based on race, color or national origin. In accordance with this policy, Chicago Fire Department employee complaints of discrimination may be submitted to the City's Office of Compliance, Department of Human Resources or to the Chicago Fire Department Internal Affairs Division.

The City's personnel rules apply to all City employees, including civilian Chicago Fire Department members. Rule XVIII, Section 1 of the Personnel Rules provides that "the City of Chicago requires that its employees perform their duties in a manner which furthers the efficiency and best interests of the City . . . [. T]he department head has the authority and responsibility to take disciplinary action against any employee whose conduct does not further the efficiency and the best interests of the City of Chicago." (Def.'s Local Rule 56.1(a)(3) Statement ¶ 11, ECF No. 76.) Rule XVIII, Section 1, Subsection 25 provides that insubordinate actions, including the failure to carry out a rule, order or directive related to the performance of the employee's duty, as well as assaulting, threatening, intimidating or abusing a supervisor either physically or verbally, are a cause for disciplinary action. Rule XVIII, Section 1,

Subsection 50 provides that conduct unbecoming an officer or public employee is a cause for disciplinary action.

**B.     Suspensions**

During his employment as a Senior Air Mask Technician, Travis received a one-day suspension in May 2008, a three-day suspension in June 2009, and a six-day suspension in December 2009.  Travis believes that the suspensions were unwarranted.

1.     <u>May 2008 Suspension</u>

On April 3, 26, and 30 in 2008, three CFD employees sent letters to Deputy District Chief Anthony complaining about problems with Travis's quality of repair work on CFD equipment.  In the first letter, Lieutenant James Solduczyk complained that Travis had repeatedly failed to properly calibrate meters and oxygen sensors.  In the second letter, Captain Lee Basile complained that Travis improperly calibrated gas meters and that Travis "did not appear to have the knowledge and expertise in dealing with this very sensitive equipment."  (Def.'s Local Rule 56.1(a)(3) Statement ¶ 30, ECF No. 76.)  In the third letter, Dive Coordinator Ron Dorneker complained about the quality of Travis's work repairing SCUBA equipment.

Around May 14-16, 2008, Anthony issued Travis a Notice of Progressive Discipline for violating Rule XVIII of the City's Personnel Rules.[1]  Anthony recommended that Travis be issued a one-day suspension.  Travis was disciplined because he had been reassigned several times from his work on several different projects due to multiple complaints about his work in the field.  Within the prior two months, Travis's work on harnesses raised concerns: one of the harnesses that Travis was assigned to repair was returned with the straps assembled backwards;

---

[1]     Although the parties' statements of facts agree that the notice was issued around May 20, 2008, the notice itself is dated May 16, 2008.  (Notice of Prog. Discipline, Travis Dep. Ex. 3, ECF No. 76-4, at 37.)  Travis refers to the suspension as a May 14, 2008 suspension in his response brief.

the SCUBA was returned with a leaking hose; and the wrong oxygen regulator was issued to an ambulance. Defendants state that Travis received a one-day suspension because of the improperly repaired equipment, although Travis denies that the suspension was warranted.

### 2. June 2009 Suspension

On April 21, 2009, while in the presence of other staff, Travis yelled repeatedly at Biniak, telling her to "shut up." On multiple occasions, Senior Air Mask Technicians Connolly and Flynn have witnessed Travis yell "shut up" at Biniak. On May 7, 2009, Anthony asked Travis to complete an assignment that should have been completed the day before. Travis yelled to Anthony, "Am I the only one who can do this?" On June 4, 2009, Anthony issued Travis a Notice of Progressive Discipline for violating Rule XVIII of the City's Personnel Rules and recommended a three-day suspension. The defendants state that because Travis had been counseled numerous times before on the need to complete assignments and that insubordination toward any supervision was unacceptable, a three-day suspension was issued. (Def.'s Local Rule 56.1(a)(3) Statement ¶ 39, ECF No. 76.) Travis denies that the suspension was warranted.

### 3. December 2009 Suspension

In December 2009, Anthony issued Travis a Notice of Progressive Discipline for violating Rule XVIII and recommended a six-day suspension. Defendants cite three reasons why Travis was suspended. First, on September 8, 2009, Biniak asked Travis to work on SCUBA units and to complete them by the end of the day. Travis responded that he was unable to start working on the SCUBA units because he was working on other equipment. Second, Travis had been repeatedly told to enter his work on a daily basis on a computer database but failed to do so. Third, Travis had previously promised to cooperate with Biniak and stop his insubordinate

behavior toward her, but then failed to do so. Travis denies that the suspension was warranted and the factual basis for the defendants' third reason.

Travis hand-wrote on his December 2009 Notice of Progressive Discipline: "I have be[en] subject to racial discrimination by the Chicago Fire Department. I have been harassed and threatened by uniformed members and they are all white and nothing is ever done to them but when I complained I am punished by these same individuals." Travis gave the Notice with his handwritten comments to Anthony.

## C.     Reassignment to Support & Logistics Division

In 1999, Travis was temporarily detailed to the Support and Logistics Division (SLD). SLD is the division of the CFD responsible for "administrating" supplies to ambulances. Travis was again detailed to SLD from about December 21, 2009, to February 16, 2010, at which time he returned to the Air Mask facility. While on temporary detail at SLD, Travis's title, pay, and benefits remained the same.

Defendants state that the decision to detail Travis to SLD was non-disciplinary and was made to help him avoid further discipline and termination in light of his prior disciplinary actions. Travis argues that he was detailed to SLD because of his race, while other non-African-American Senior Air Mask Technicians with less seniority were not detailed. Travis is not aware of the seniority of the other non-African-American Senior Air Mask Technicians.

When Travis was initially notified of CFD's intention to detail him to SLD, he was told that he could file a grievance regarding the detail. The first time Travis was detailed to SLD, he did not complain or grieve the detail. On December 24, 2009, Travis filed a grievance to request that he be returned to the Air Mask facility based on a violation of the detailing procedure. Travis believes that Biniak denied his grievance based on Travis's race. Biniak did not sign the

grievance form or participate in the denial of Travis's grievance.[2]  On February 9, 2010, Travis was notified that he would be returned to the Air Mask facility on February 16, 2010.

**D.     Travis's Claims**

On February 12, 2010, Travis filed an administrative charge with the Equal Employment Opportunity Commission alleging discrimination on the basis of his race in violation of Title VII.  Travis filed his initial complaint against the City and the individual defendants on May 7, 2010, and filed his second amended complaint on July 30, 2012.  The complaint alleges violations of 42 U.S.C. § 1983 and Title VII against the City, and violations of § 1983 against the individual defendants.  Specifically, he alleges that the defendants' racial discrimination, harassment, and retaliation created a hostile work environment and substantially interfered with his ability to perform his job.  Travis also alleges that the City failed to adequately train and supervise its employees, which led to violations of Travis's constitutional rights.

Travis alleges that Biniak referred to African-Americans as "shines" and commented to him that a nearby parking lot was a "shine parking lot."  He further alleges that Biniak told Travis that all African-Americans lived in the projects, were drug addicts, and were in gangs. Biniak denies making these remarks.  Biniak allegedly talked to Travis by changing her voice to imitate what he calls "an uneducated 'ghetto-type African American person.'"  (Pl.'s Local Rule 56.1(b)(3)(C) Statement ¶ 5, ECF No. 92.)  Travis alleges that Biniak accused an African-American summer intern who had a design cut into his eyebrow of being a gang member.  Biniak testified that when she asked the intern why he had the symbol in his eyebrow, the intern responded that it meant "gangs."

Travis's desk is located directly above a sewer drain.  On numerous occasions, raw sewage backed up through this drain directly under Travis's workstation.  Travis complained

_____
[2]        Travis denies this fact but does not point to any countervailing facts.

numerous times about the backup to Biniak. Biniak admits that she told Travis that he should brush his teeth with the sewer water and jump out the window to avoid the sewage. Biniak says she made the comment because she was annoyed that Travis repeatedly complained about the sewage backup. Biniak conceded that her comments did not foster a professional work environment.

Travis testified in his deposition that Anthony accused him of "playing the race card," but Anthony denies that he made such a comment.

**E.      Other Senior Air Mask Technicians**

Travis argues that other non-African-American Senior Air Mask Technicians were treated more favorably than he was. Specifically, he alleges that the white Senior Air Mask Technicians were never disciplined. Travis admits that he has no evidence of whether other technicians were accused of similar misconduct or disciplined for similar infractions as he was, as he never reviewed the discipline records for the other technicians. The defendants admit that technicians Connolly and Flynn were not disciplined for failing to complete their work assignments. Flynn testified if he was unable to complete a priority task on the same day it was assigned, he would seek permission from and inform Biniak. Connolly testified that he has never failed to complete a priority task on the same day on which it was assigned.

Travis avers that Connolly and Flynn spoke to Biniak in the same way as he did but were never disciplined. In support of this assertion, Travis cites his deposition testimony. There, Travis clarified: "I've heard them refuse to do stuff for her numbers of times. 'Oh, do this and do that.' They won't do it." (Travis Dep. 334:23-335:1, ECF No. 92-3.)

Anthony submitted an affidavit indicating that a non-African-American Senior Air Mask Technician was disciplined for violations of the City's personnel rules and was issued three suspensions lasting five, ten, and thirty days for the violations.

## II. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## III. ANALYSIS

### A. Discrimination

To withstand a motion for summary judgment on his Title VII and § 1983 discrimination claim, Travis must put forth evidence that he suffered an adverse employment action and that the action was the product of discrimination based on his race or national origin.

There are two ways for a plaintiff to establish that an adverse employment action was the product of discrimination. Under the "direct method," a plaintiff must "point to enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue." *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 749 (7th Cir. 2010). The focus of the direct method of proof is whether the evidence offered "points directly" to a discriminatory

reason for the employer's action.  *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009).

Alternatively, under the "indirect method," the plaintiff must establish a prima facie case of discrimination by showing (1) he is a member of a protected class; (2) his performance met the employer's legitimate expectations; (3) despite this performance, he was subjected to an adverse employment action; and (4) his employer treated similarly situated employees outside of the protected class more favorably.  *See Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 554 (7th Cir. 2011); *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004) (noting that the second and fourth prongs of this test "merge" when the allegations relates to a disparate punishment).  Only after a plaintiff establishes this prima facie case does the burden shift back to the defendants to "articulate a legitimate, non-discriminatory reason for the adverse employment action."  *See South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 751 (7th Cir. 2007).  If the defendants can do so, the ultimate burden shifts back to the plaintiff to present evidence showing that the defendants' purported reason for the adverse action was pretextual.  *Id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

1.      Adverse Employment Action

As a prima facie element of Travis's discrimination claim, Travis must show that he was subject to an adverse employment action regardless of whether he proceeds under the direct or indirect method.  Travis argues that he was subject to two forms of adverse employment actions: (1) his three suspensions, and (2) his reassignment to the SLD from December 2009 to February 2010.  For discrimination claims, an employment action is an adverse employment action if it involves "a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities,

or an action that causes a substantial change in benefits." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).

The parties agree that a suspension is an adverse employment action. But the defendants dispute that Travis's reassignment to the SLD is an adverse employment action. Travis admits that while he was on temporary detail to SLD, his title, pay and benefits remained unchanged. But Travis argues that his job responsibilities were significantly different; he argues that when he was in SLD, his responsibilities changed from technical repair duties to sweeping and mopping floors, shoveling snow, cleaning toilets, packaging bandages, and restocking ambulances. The court cannot say, as a matter of law, that these responsibilities were similar to or equivalent in prestige to Travis's responsibilities in the Air Mask Division. Travis has shown at least a question of fact as to whether his reassignment to SLD was an adverse employment action. Thus, for the purposes of analyzing Travis's discrimination claim, the court assumes that both Travis's suspensions and reassignment to SLD constitute adverse employment actions.

2.      Merits

Travis argues that he can establish his prima facie case under both the direct and indirect methods. Analyzing the direct and indirect methods separately present "snarls and knots . . . inflicted on courts and litigants alike." *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J. concurring). "In order to defeat summary judgment, the plaintiff one way or the other must present evidence showing that [he] is in a class protected by the statute, that [he] suffered the requisite adverse action (depending on [his] theory), and that a rational jury could conclude that the employer took that adverse action on account of [his] protected theory." *Id.* Judge Wood, joined in her concurrence by the other panel members, proposes: "it seems to me that the time has come to collapse all these tests into one. We have already done so, when it comes to the

trial stage of a case. It is time to finish the job and restore needed flexibility to the pre-trial stage." *Id.* (internal citation omitted).

This court shares the *Coleman* panel's concerns with forcing Title VII analysis into a "direct" and "indirect" dichotomy. Indeed, the current formulation of the direct method has evolved into something resembling the indirect method. In 2000, the Seventh Circuit stated that proving discrimination via direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Four years later, the Seventh Circuit noted that a plaintiff may proceed under the direct method using "a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Rhodes*, 359 F.3d at 504 (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)); *see also Coleman*, 667 F.3d at 863 (Wood, J., concurring) ("Like a group of Mesopotamian scholars, we work hard to see if a 'convincing mosaic' can be assembled that would point to the equivalent of the blatantly discriminatory statement.").

While Travis's accusations in this case involve blatantly discriminatory statements, the paucity of evidence before the court presents a significant challenge in analyzing the case under the direct method. The record contains no evidence of times or dates when Biniak allegedly made the comments. The court therefore cannot precisely tie the explicitly racist comments of which Travis complains to the adverse employment actions. *See Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir. 1998) ("To rise to the level of direct evidence of discrimination, [the Seventh Circuit] has stated that 'isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process.'") (quoting *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996)).

But the record is not devoid of evidence on timing. In his deposition, Travis testified that Biniak made disparaging remarks to him "all the time" and that he cannot "walk in the door of that place, even to this day, without her saying anything really derogatory and nasty to me." (Travis Dep. 56:23-57:2, ECF No. 76-3.). He stated that Biniak made remarks about "blacks all being drug addicts and gang members" for "a period of years," "repeatedly," "for ten plus years at least." (*Id.* 253:8-254:6.) True, Travis does not pinpoint exact dates on which these comments were made. But Travis has done enough to overcome summary judgment. Based on Travis's deposition testimony, a reasonable fact-finder could (but would not be required to) find that Biniak's comments were temporally proximate to the adverse employment actions taken against Travis.

Moreover, it is not clear that a prima facie claim for discrimination requires evidence of temporal proximity. Once a Title VII discrimination plaintiff shows that he suffered an adverse employment action and is a member of a protected class, his sole burden to overcome summary judgment is to show that "'a rational jury could conclude that the employer took that adverse action on account of [his] protected class.'" *Hester v. Ind. State Dep't of Health*, 726 F.3d 942, 946 (7th Cir. 2013) (quoting *Coleman*, 667 F.3d at 863 (Wood, J., concurring)). Biniak's alleged frequent and repeated remarks about "shines" and "shine parking lots," adoption of a fake "ghetto" accent, and comments about African-Americans being gang members are sufficient for a reasonable jury to conclude that Biniak harbored racial animus and sought discipline of Travis for that reason.

In short, the court concludes that Travis has sufficiently disputed defendants' facts to overcome summary judgment on his discrimination claim under the direct method. A reasonable fact-finder could conclude that there is sufficient evidence showing that Travis's detail to SLD

and his three-day and five-day suspensions in June and December 2009, respectively, were the result of intentional discrimination.

A reasonable fact-finder could not, however, find that Travis's May 2008 one-day suspension was the result of intentional discrimination. Travis received that suspension because of multiple complaints about his work performance. Travis does not allege that Biniak was involved in the decision to suspend him, nor does he allege that the complainants harbored racial animus against African-Americans. Thus, the defendants are entitled to judgment as a matter of law on Travis's claim of discrimination for his May 2008 suspension.

Having determined that Travis can overcome summary judgment based on the direct method for the detail to the SLD and his three- and six-day suspensions, the court need not evaluate the merits of those claims under the indirect method. *Cf. Coleman*, 667 F.3d at 845 ("Because [plaintiff] presented sufficient evidence to survive summary judgment under the indirect method, there is no need to evaluate [his] discrimination claims under the direct method.").

As for the one-day suspension, Travis would have to show that his performance met his employer's legitimate expectations as a prima facie element of his claim under the indirect method. *See Eaton*, 657 F.3d at 554. He cannot do so. He has offered evidence neither that the complaints about his work were factually baseless nor that other employees made similar errors for which they were not disciplined. The undisputed facts show that Travis improperly completed repairs of equipment and that he was suspended on that basis.

In conclusion, the defendants' motion for summary judgment is denied as to Travis's claim of discrimination for his detail to the SLD and his three-day and six-day suspensions. The motion is granted as to his May 2008 one-day suspension.

**B.     Retaliation**

Travis argues that he was retaliated against for complaining about racial discrimination, and that "[i]n response to his complaints, Travis was treated to even more discrimination by Defendants." (Pl.'s Resp. 18, ECF No. 88.)  As is the case with a discrimination claim, Travis can attempt to prove retaliation under the direct or indirect methods.

      1.     <u>Statutorily Protected Activity</u>

Under both the direct and indirect methods, a plaintiff must show that he engaged in statutorily protected activity.  Complaints of discrimination are statutorily protected activity, but the "complaint must indicate the discrimination occurred because of . . . race . . . or some other protected class. . . .   Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (internal citations omitted).

Travis identifies two sets of complaints that he believes are statutorily protected activity: letters dated April 7, 2009; May 18, 2009; and May 27, 2009 (Pl.'s Ex. Q, ECF No. 92-18), and appeals he submitted regarding his suspensions dated May 19, 2008; June 10, 2009; and September 29, 2009 (Pl.'s Ex. M, ECF No. 92-14).

The April 7, 2009 and May 27, 2009 letters and the May 19, 2008 grievance form contain Travis's complaints about his treatment, but they do not mention race or any other protected class.  The June 10, 2009 grievance form states that Travis experienced "unfair and biased and discriminatory treatment" (ECF No. 92-14, at 2), but as noted in *Tomanovich*, a generalized complaint of discrimination without a connection to a protected class does not qualify as a statutorily protected activity.  *Tomanovich*, 457 F.3d at 663.  There is no basis in these

documents upon which a fact-finder could conclude that Travis was complaining about discrimination on the basis of race or some other protected class.

The May 18, 2009 letter, however, contains one mention of race: "I am also the only Black technician and I think that has something to do with it. I pray to God and hope I am wrong and I haven't been given any reason to think other wise." (ECF No. 92-18, at 4.) And the September 29, 2009 grievance states: "In the past I have been treated racially indifferent [sic]." (ECF No. 92-14, at 3.) These documents satisfy the *Tomanovich* test and constitute statutorily protected activity.

### 2.    May 2008 Suspension

The court notes that summary judgment is appropriate to the extent that Travis believes his one-day suspension around May 14-16, 2008 constitutes retaliation. The earliest statutorily protected activity that Travis identifies is his appeal of that suspension on May 19, 2008. Retaliation cannot occur before the statutorily protected activity. Thus, the remainder of the court's analysis assumes that Travis's argument alleges retaliation in the form of his three- and six-day suspensions and his detail to the SLD.

### 3.    Direct Method

Under the direct method, "[t]o make out a prima facie claim of retaliation under Title VII or § 1981, a plaintiff must allege that (1) [he] engaged in statutorily protected activity; (2) [he] suffered an adverse employment action taken by the employer; and (3) a causal connection exists between the two." *Jordan v. Whelan Security of Ill., Inc.*, No. 12 C 10158, -- F. Supp. 2d --, 2014 WL 1257019, at *5 (N.D. Ill. Mar. 21, 2014). As noted above, Travis engaged in statutorily protected activity by complaining of racial discrimination in a May 18, 2009 letter and a September 29, 2009 grievance. Travis arguably suffered adverse employment actions in the

form of suspensions in June 10 through 12, 2009, and September 14 through 20, 2009; and in his temporary detail to SLD from about December 21, 2009 through February 16, 2010.

Having successfully satisfied the first two elements of the prima facie case of retaliation under the direct method, Travis must now demonstrate a causal connection between the statutorily protected activity and the adverse employment actions. Travis alleges that in response to his May 2009 letter, he was subjected to unwarranted discipline in June 2009. And Travis alleges that in response to his December 2009 letter, he was subject to unwarranted discipline by being wrongfully detailed to SLD beginning in December 2009. To demonstrate the causal connection, Travis relies solely on the temporal proximity between his complaints and the adverse employment actions.

In *Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012), the Seventh Circuit explained that "an interval of a few weeks or even months may provide probative evidence of the required causal nexus" when there is corroborating evidence of retaliatory motive. *Coleman*, 667 F.3d at 861. But the court cautioned: "We have often invoked the general rule that 'temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter.'" *Id.* at 860 (quoting *O'Leary v. Accretive Health*, 657 F.3d 625, 635 (7th Cir. 2011)). "When temporal proximity is one among several tiles in an evidentiary mosaic depicting retaliatory motive, however, '[s]uspicious timing . . . can raise an inference of a causal connection.'" *Id.* (quoting *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008)).

In *Coleman*, the plaintiff buttressed her timing evidence with "evidence that the employer's stated reason for acting was pretextual, which also tends to support an inference of retaliation." *Id.* at 861. The court concluded: "On their own, Coleman's evidence of suspicious

timing and pretext might not be enough to show a causal connection between her protected activities and her suspension or termination.  Together, however, they are sufficient to withstand summary judgment and create a question for the jury." *Id.* at 862.

Travis offers no corroborating evidence to prove the causal nexus between his statutorily protected activity and the adverse employment actions; as the Seventh Circuit has repeatedly noted, timing alone is insufficient to avoid summary judgment.  *See Moultrie v. Penn Aluminum Int'l, LLC*, No. 13-2206, -- F.3d --, 2014 WL 4435864, at *6 (7th Cir. Sept. 10, 2014) ("Apart from allegedly suspicious timing . . . no evidence demonstrates that the [plaintiff's] demotion was caused by his protected activity.  And speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation." (internal quotation marks omitted)); *Coleman*, 667 F.3d at 835; *O'Leary*, 657 F.3d at 635.

Unlike the discrimination issue, defendants have put Travis to the test to show some evidence of a causal connection; their statement of facts states: "Anthony testified that he did not recommend any of Plaintiff's disciplinary actions because . . . of any other charge or complaint he made."  (Def.'s Local Rule 56.1(a)(3) Statement ¶ 66, ECF No. 76.)  Travis agrees that Anthony gave that testimony but offers no countervailing evidence to show a causal connection, choosing to rely solely on suspicious timing to present an issue of fact precluding summary judgment.  Seventh Circuit precedent clearly dictates that suspicious timing alone is insufficient to overcome summary judgment.  Travis's retaliation claim fails under the direct method because Travis has not offered evidence showing that there is a question of fact on the causal connection between his complaints and an adverse employment action.

4.    Indirect Method

A prima facie case under the indirect method requires a plaintiff to show that he: "(1) engaged in statutorily protected activity; (2) met his employer's legitimate expectations; (3) suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in protected activity." *Moultrie*, 2014 WL 4435864, at *6. If the plaintiff succeeds in establishing a prima facie case, "then the burden shifts to the [defendant] to produce a non-discriminatory reason for its employment action. If the [defendant] meets its burden of production, then the burden of proof remains with [the plaintiff] to demonstrate that the [defendant's] proffered reason is pretextual." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007). "Under this method, plaintiffs need not show even an attenuated causal link." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014). As noted above, Travis fulfills the first and third elements of his prima facie burden.

"To the extent that the plaintiff claims that he was subject to disparate punishment . . . the second and fourth prongs of *McDonnell Douglas* merge. In those situations, there is no question that the employee failed to meet his employer's expectations. Instead, the plaintiff must establish that he received dissimilar—and more harsh—punishment than that received by a similarly situated employee who was outside the protected class." *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004) (internal citations omitted).

"The similarly situated analysis requires a context-based examination of all relevant factors. It ought not be construed so rigidly or inflexibly that it [becomes] a useless analytical tool." *Eaton*, 657 F.3d at 556 (internal quotation marks and citations omitted). "This generally requires the plaintiff to show that the comparator had the same supervisor, was subject to the same employment standards, and had engaged in conduct similar to that of the plaintiff." *Id.*

Travis identifies two comparators who occupy the same position as he does: fellow Senior Air Mask Technicians Connolly and Flynn. Travis produced evidence showing that Connolly and Flynn have the same job title and responsibility as Travis does. Travis also produced evidence indicating that he repaired the second highest number of pieces of equipment compared to his co-workers between January 1, 2008, and June 5, 2013. Connolly and Flynn both testified that there were instances in which they were unable to complete tasks on time.

In Travis's deposition and statement of facts, he indicates that Connolly and Flynn often spoke to Biniak in disrespectful ways and "refuse[d] to do stuff for her numbers of times." (Travis Dep. 334:23-24, ECF No. 92-3.) Although Travis has not identified any instances in which Connolly and Flynn told a supervisor to "shut up," the similarly situated analysis does not require that the comparators be identical to the plaintiff. Rule XVIII, Section 1, Subsection 25 of the City's Personnel Rules provides that insubordinate actions include failure to carry out a rule, order, or directive related to the performance of the employee's duty. A reasonable fact-finder could conclude that Connolly and Flynn violated the city's insubordination policy, just as Travis did when he told Biniak to "shut up." But Connolly and Flynn were not disciplined for their insubordination. Based on this record, a reasonable fact-finder could find that Connolly and Flynn are "similar enough [to Travis] that any differences in their treatment cannot be attributed to other variables." *Eaton*, 657 F.3d at 556 (internal quotation marks omitted). Accordingly, Travis can establish a sufficient prima facie case of retaliation under the indirect method to overcome summary judgment.

Once Travis establishes his prima facie case, the burden shifts to the defendants to provide a legitimate, non-discriminatory reason for the adverse employment action. They do so, citing Travis's poor work performance and insubordination. The burden then shifts back to

Travis to show that these reasons were pretextual. For a plaintiff to establish pretext, he "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [the defendants'] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the defendants] did not act for the asserted non-discriminatory reasons." *Bouhmedi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).

The factual record indicates that Connolly and Flynn were not disciplined for their alleged insubordination toward Biniak. And the defendants admit that Connolly and Flynn were not disciplined for their failure to complete their tasks on time. Travis, unlike Connolly and Flynn, was disciplined for his insubordination and failure to complete tasks on time. Based on these facts, a fact-finder could reasonably conclude that the defendants' reasons for taking adverse employment action against Travis were pretextual. As a result, the defendants are not entitled to summary judgment on Travis's claim of retaliation under the indirect method.

## C.     Hostile Work Environment

Travis alleges that he experienced a hostile work environment based on five incidents involving Biniak. Travis alleges that Biniak "(1) derogatorily referred to African Americans as 'shines,' and commented that a nearby parking lot was a 'shine parking lot;' (2) commented that all African Americans lived in the projects, were drug addicts and were in gangs; (3) talked to Travis by changing her voice in a mocking manner to imitate an uneducated 'ghetto-type' African American person; (4) accused an African American summer intern who had a design cut into his eye brow of being a gang member; and (5) stated Travis should drink and brush his teeth with sewer water and should jump out of the window to avoid the sewage." (Pl.'s Resp. 15, ECF No. 88.)

"Title VII prohibits the creation of a hostile work environment." *Vance v. Ball State Univ.*, -- U.S. --, 133 S. Ct. 2434, 2441 (2013). To avoid summary judgment on a hostile work

environment claim, a plaintiff "must demonstrate that: (1) [he] was subject to unwelcome harassment; (2) the harassment was based on [his] race; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of [his] employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004).

To be actionable as a hostile work environment, the "environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). Statements such as those described by Travis are objectively offensive and Travis testified that they significantly disturbed him. Many of the statements are explicitly insulting in racial terms. Travis can survive summary judgment on the first two elements of his hostile work environment claim.

Travis has also shown that there is a fact question as to whether the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create a hostile work environment. In evaluating the "sufficiently severe or pervasive" element, "courts . . . determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787-88 (internal quotation marks omitted). This is a "fact-intensive inquiry" "compelling the court to ask whether a reasonable person would find the environment hostile." *Robinson v. Sappington*, 351 F.3d 317, 329 (7th Cir. 2003).

In Travis's deposition, when asked how often Biniak made disparaging remarks, Travis replied: "Oh, Debbie [Biniak] does it all the time. I can't walk in the door of that place, even to this day, without her saying something really derogatory and nasty to me." (Travis Dep. 56:23-57:2, ECF No. 76-3.) Based on the record presented, a reasonable fact-finder could find that Biniak's remarks were frequent, severe, and unreasonably interfered with Travis's work performance to the point that Travis complained of the discrimination. Travis has demonstrated that there is at least a question of fact as to whether he can satisfy the third element of a hostile work environment claim.

To prevail on a claim for a hostile work environment, Travis must also establish a basis for employer liability. Under Title VII, the theory under which an employer may be held liable for harassment depends on whether the harasser is the victim's co-worker or supervisor. "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance*, 133 S. Ct. at 2439. But "an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 2443 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).

Travis asserts that Biniak is a supervisor for Title VII purposes because she "has the power to directly affect the terms of his employment." (Pl.'s Resp. 15, ECF No. 88.) The undisputed facts indicate that Biniak's control over Travis is limited to distributing daily work assignments to the Senior Air Mask Technicians such as Travis and recommending discipline to her superiors. In *Vance*, the Supreme Court granted certiorari to reject "the more open-ended

approach . . . which ties supervisor status to the ability to exercise significant direction over another's daily work." *Vance*, 133 S. Ct. at 2443. "[B]ecause [Biniak] did not have direct authority to hire, fire, demote, promote, transfer, or discipline [Travis, the City] could not be liable for [Biniak's] actions unless it was negligent in failing to prevent [her] harassment." *Reed v. Lincare, Inc.*, 524 F. App'x 261, 262 (7th Cir. 2013). Under *Vance*, Biniak is a co-worker rather an a supervisor for Title VII purposes.

"[W]hen a co-worker harasses an employee, the employer is liable only if the employer is negligent in discovering or remedying the harassment." *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 866-67 (7th Cir. 2013). Travis argues that he advised Killman, Callahan, O'Donnell and Anthony of the hostile work environment created by Biniak, but that nothing was done to remedy it. Although Travis was advised that he could seek a remedy through the EEOC, the Illinois Department of Human Rights, the Chicago Commission on Human Relations, or the City of Chicago Office of Compliance, he argues that these options were insufficient. He notes that the City's Personnel Rules require a department receiving a discrimination charge to file a referral with the City's human resources department. The department must then "commence a full investigation of the charge or direct the prompt commencement of a full investigation of the charge by the department, unless the Director of Affirmative Action determines that action other than a full investigation is appropriate." (Pl.'s Ex. N 2, ECF No. 92-15). Travis avers that no investigation was initiated, and the defendants do not argue otherwise.

To satisfy its obligations under Title VII, an employer must "take prompt action reasonably calculated to end the harassment and reasonably likely to prevent the conduct from recurring." *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 813 (7th Cir. 2001). A fact-finder could find that the City's failure to initiate an investigation after Travis complained of discrimination

violated City Personnel Rules. It could also find that the City failed to take prompt action reasonably calculated to end the harassment when it referred Travis to other agencies rather than attempting to address Travis's allegations through its investigatory procedure. Thus, a fact-finder could reasonably conclude that the City was negligent in remedying the harassment, and this negligence would create a basis for employer liability.

Because Travis has shown that questions of material fact exist on whether he can prove his claim for a hostile work environment, defendants are not entitled to judgment as a matter of law on that claim. Accordingly, defendants' motion for summary judgment on the hostile work environment claim is denied.

## IV. CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is granted in part and denied in part. The motion is granted with respect to the discrimination claim based on Travis's one-day suspension in May 2008, but is denied as to the remaining aspects of the claim. The motion is granted with respect to the retaliation claim based on Travis's one-day suspension in May 2008, and is otherwise denied. The motion is denied as to Travis's hostile work environment claim. A status hearing is set for October 9, 2014 at 9:30 a.m in courtroom 1858.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 30, 2014